IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 3:23-cv-716-ECM |
| ) | [WO] |
| $881,147.41 SEIZED FROM ) | |
| JPMORGAN CHASE BANK, N.A. ) | |
| ACCOUNT NUMBER XXXXX9087, ) | |
| IN THE NAME OF KINGDOM ) | |
| MANIEL INVESTMENTS TRUST, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION and ORDER**

**I.  INTRODUCTION**

This *in rem* civil forfeiture action arises out of an alleged advance fee scheme in which Raul Hernandez ("Hernandez") fraudulently induced Dustin Blomeyer ("Blomeyer") and Robert Chapman ("Chapman") to pay RMH Capital Group ("RMH"), Hernandez's company, $950,000 in advance fees for business loans that never materialized. Claimants Kingdom Maniel Investments Trust and Maniel Group Mexico S.A.P.I DE C.V. (collectively, "Claimants" or "Maniel")[1] assert that they contracted with Blomeyer, Chapman, and RMH to provide due diligence and paymaster services for the loan deals. Following these agreements, Blomeyer and Chapman wired their respective funds to JPMorgan Chase account number XXXXX9087, in the name of KINGDOM

---

[1] Kingdom is an affiliate of Maniel. (Doc. 25 at 3, para. 8).

MANIEL INVESTMENTS TRUST, LUIS GONZALEZ TRUSTEE ("JPMorgan 9087"), where the funds remained until seized by Plaintiff United States of America ("Government") in November 2023. After the Claimants filed a verified claim to the seized funds, the Government moved to strike it, arguing the Claimants lack Article III and statutory standing. After a careful review of the record and the parties' briefing, and with the benefit of an evidentiary hearing and oral argument, the Court finds that, at this stage, the Claimants have standing, and the motion to strike is due to be denied.

## II. JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1345, 1355(a). Personal jurisdiction and venue are uncontested, and the Court concludes venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1355(b).

## III. BACKGROUND

The Court recites only the facts necessary for resolution of the motion to strike. As mentioned above, the Government alleges that Blomeyer and Chapman, who were seeking loans to expand their respective businesses, were defrauded out of nearly one million dollars by RMH as part of an advance fee scheme. After months of negotiations and discussions, Blomeyer and Chapman each signed two contracts with RMH.[2] (Docs. 25, 41). Blomeyer's first contract, which he signed on August 9, 2022, stated in relevant part:

> [RMH] will request [Blomeyer] to make payment of the Initial Retainer Fee of US$ 50,000 for legal fees and third-party expenses, due at the signing of this Term Sheet. The Contract for Services Retainer Fee (CSR) of US$ 300,000.00 as it will

---

[2] Blomeyer was promised $150,000,000 (doc. 25-1 at 8), and Chapman was promised $10,000,000 (*id.* at 17).

2

> be defined within the Contract for Services Offer ("CSO or MOU"), will be payable upon execution and return of a subsequent CSO after all processing, due diligences, investigation report are completed, as well as the vetting of the representative(s) of the Company.  The second fee of $300,000.00 is due when the RWA is received by the Company with an estimated time of 15 to 20 business days from the execution of the CSO.  The final $300,000.00 will be required at least 10 (Ten) business days before the funds are wired and received by the Paymaster or Escrow Agent.  In the event of mutual cancellation by the Parties, the CSR shall be fully refundable, **less fees and costs incurred to the date** of that cancellation.[3]

(Doc. 25-1 at 10 (errors in original) (emphasis added)).  Blomeyer signed a subsequent agreement on October 16, 2022.  It stated, in relevant part:

> Pursuant to the Contract, [Blomeyer] shall deliver to RMH Capital Group, LLC [retainer fees] for distribution to the relevant parties in connection with due diligence, processing and related retainers.
>
> It is our understanding that, RMH Capital Group, LLC shall have exclusive rights over such monies and/or other assets, and may anticipate in the future receiving additional monies and/or assets, and requests and authorizes Ma Niel Group Mexico and Ma Niel UK Limited to serve as a paymaster, escrow agent, custodial agent or fiduciary on behalf of RMH Capital Group, LLC, as a beneficiary, for the sole purposes of receiving, holding and disbursing such monies and/or other assets for the benefit of RMH Capital Group, LLC and for depositing such funds into one or more accounts or other accounts, and RMH Capital Group, LLC shall seek to direct and disburse such funds from time to time, in connection with the due diligence,

---

[3] Chapman signed a similar contract on November 1, 2022, with the primary difference being that he was to pay a total of $300,000 in three installments: $150,000; $100,000; and $50,000.  Importantly, "[i]n the event of mutual cancellation" by Chapman and RMH, the fees would "be fully refundable, less fees and costs incurred to the date of that cancellation." (Doc. 25-1 at 18–19).

3

> processing and related retainers as described an according with the previously executed agreement.[4]

(*Id.* at 14 (errors in original)).  Basically, Blomeyer and Chapman were to wire funds (the advance fees) to an account in the name of Claimants, who were to hold onto the money subject to the direction of RMH while Claimants performed due diligence services for the respective deals.  And in the event either deal was cancelled by both parties, the funds would be fully refunded to Blomeyer or Chapman minus the fees and costs incurred in conducting due diligence, which would remain with the Claimants.  Between October 18 and November 22, 2022, Blomeyer wired $600,000 into JPMorgan 9087. (Docs. 25, 41).  Between October 13 and November 21, 2022, Chapman wired $350,000 into the account. (*Id.*).  Prior to these transfers, minimal to no activity occurred in JPMorgan 9087. (Doc. 41).

It is undisputed that Blomeyer and Chapman never received the loans they had been promised by RMH.  Following two unsuccessful attempts at receiving a refund of his fees, Blomeyer provided a notice of termination of his agreements to RMH on February 21, 2023. (Doc. 41 at 4).  Blomeyer reached out to investigators, who seized the Defendant, $881,147.41[5] from JPMorgan 9087 ("Defendant Funds"), in November 2023. (Doc. 1 at 7).

---

[4] Chapman signed a materially similar agreement on an unspecified date. (*See* doc. 25-1 at 23–24).

[5] The Court notes that while the Government alleges $950,000 were transferred into JPMorgan 9087, the amount seized was approximately $70,000 short of that.  When asked at the evidentiary hearing where that money went, the Claimants stated that they were unaware of any discrepancy and the Government did not respond.  At another point in the hearing, however, the Government represented to the Court that "investigation has revealed that some of [Blomeyer's and Chapman's] money was actually used to buy a car, a BMW.  And on the check paying for the car, it was designated as a birthday present to Mr. González's wife."

On April 11, 2024, the Claimants filed their verified claim. (*See* doc. 25). In addition to the above contracts, the Claimants provided the declarations of José Luis González ("González"), the trustee and representative of Claimants, and Hernandez. González wrote that "RMH agreed to have Maniel . . . conduct due diligence investigations and reports needed to further what [he] understood to be funding ventures. . . . RMH also agreed that in exchange for providing these services, Maniel would be entitled to reimbursement—from funds collected by borrowers to RMH's funding ventures—for the costs that [Claimants] incurred" in connection with these services. (Doc. 25 at 2). González further stated that Claimants "did successfully conduct Due Diligence Services" and incurred "approximately $295,601.65" in fees and costs doing so. (*Id.*). In addition to providing due diligence services, "RMH also agreed to have Maniel . . . serve as paymaster, escrow agent, custodial agent, or fiduciary on behalf of RMH, as a beneficiary, for the sole purposes of receiving, holding and disbursing such monies and other assets for the benefit of RMH for the funding ventures with Blomeyer and Chapman." (*Id.* at 3). Like the due diligence services, González stated that "in exchange for providing these services, [Claimants] would be entitled to reimbursement—from funds collected by borrowers to RMH's funding ventures—for the costs that Maniel incurred." (*Id.*). In Hernandez's declaration, he supports González's version of events. (*See* doc. 25-1).

In their response to the Government's motion to strike, the Claimants attached González's declaration from a separate proceeding and a letter from JPMorgan Chase to González. (*See* doc. 45). In this declaration, González wrote that he is "the sole trustee of [Claimant Kingdom] with full power to act on behalf of [Claimant Kingdom]" and "the

sole signatory" on JPMorgan 9087.  (Doc. 45-1 at 3).  In the letter to González, dated June 21, 2023, JPMorgan Chase discussed the "restriction" placed on "[Claimants']" account.[6] (*Id.* at 6).  It urged the Claimants to contact the bank "as soon as possible" or otherwise the account "may close" soon. (*Id.*).  It informed Claimants that if the bank "close[d] the account and there [was] a remaining balance, [the bank would] send [Claimants] a check by mail to the address on file." (*Id.*).

## IV.  DISCUSSION

"Civil asset forfeiture cases are governed by the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions." *See United States v. $134,972.34 Seized from FNB Bank, Acct. No. £5351*, 94 F. Supp. 3d 1224, 1228 (N.D. Ala. 2015)[7] (citing 18 U.S.C. § 983(a)(4)(A) ("In any case in which the Government files in the appropriate United States district court a complaint for forfeiture of property, any person claiming an interest in the seized property may file a claim asserting such person's interest in the manner set forth in the Supplemental Rules for Certain Admiralty and Maritime Claims, . . .")).  Supplemental Rule G "governs a forfeiture action *in rem* arising from a federal statute." FED. R. CIV. P. SUPP. G.  Pursuant to Supplemental Rule G(8), "[a]t any time before trial, the government may move to strike a claim or answer . . . because the claimant lacks standing.  The motion . . . may be presented as a motion for judgment on the pleadings

---

[6] The Court gathers that JPMorgan Chase froze the funds in the account "[t]o protect against potential fraud" in June 2023, although the funds were not formally seized by the Government until November 2023. (*See* doc. 45-1 at 6).

[7] Here, and elsewhere throughout this Opinion, the Court cites nonbinding authority.  While the Court acknowledges that these cases are nonprecedential, the Court finds them persuasive.

or as a motion to determine after a hearing or by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence." FED. R. CIV. P. SUPP. G(8)(c)(ii)(B). Pursuant to this rule, the Government moves to strike the Claimants' claim, arguing that the Claimants lack both Article III and statutory standing. The Court addresses each argument in turn, before addressing other outstanding motions.

A.      **Article III Standing**

"In contesting a civil forfeiture action, the claimant is required to demonstrate standing under both Article III of the Constitution and under the statue governing its claim." *United States v. All Funds in the Acct. of Prop. Futures, Inc.*, 820 F. Supp. 2d 1305, 1325 (S.D. Fla. 2011) (citing *United States v. $38,000.00 Dollars in U.S. Currency,* 816 F.2d 1538, 1543–44 (11th Cir. 1987)). "In a forfeiture action, the determination of whether a claimant has Article III standing turns upon whether the claimant has a sufficient interest in the property to create a 'case or controversy'; sufficient interest in the property satisfies the 'injury' requirement for purposes of standing." *Id.* "Ownership of property that has been seized can be evidence of the existence of an injury that is direct enough to confer standing, but ownership is not required; non-owners, such as bailees or those with possessory interests, can also have injuries resulting from the seizure of property that are sufficient to establish standing." *Via Mat Int'l S. Am. Ltd. v. United States*, 446 F.3d 1258, 1262–63 (11th Cir. 2006) (citing *$38,000 Dollars in U.S. Currency*, 816 F.2d at 1544 (holding that a bailee has a sufficient possessory interest for standing)).

"While ownership or possession of property may provide evidence of standing, and in some circumstances act as, in effect, a surrogate for an inquiry into whether there is

injury direct enough and sufficient enough to sustain standing, it is *injury* that is at the heart of the standing question." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999); *see also Via Mat Int'l S. Am. Ltd.*, 446 F.3d at 1262 ("At the heart of Article III standing is the existence of an injury, not ownership."). "[E]conomic harm to a party with a possessory interest in seized property . . . can constitute a palpable injury sufficient to confer standing under Article III." *Via Mat Int'l S. Am. Ltd.*, 446 F.3d at 1263. At bottom, "[a] claimant must have a 'facially colorable interest' in the property at issue, and courts have repeatedly noted that this standard is not difficult to satisfy." *United States v. Assets Described in Attachment A to the Verified Complaint Forfeiture In Rem*, 799 F. Supp. 2d 1319, 1322 (M.D. Fla. 2011) (collecting cases).

The Government argues that the Claimants lack Article III standing because they are not the owner of the funds, and they exercised no dominion or control thereover. The Claimants disagree and assert that they "have articulated a possessory interest in certain funds seized sufficient to confer on them standing to assert a claim." (Doc. 45 at 10). In support, they point to three pieces of record evidence: (1) the declarations in which they claim entitlement to payment from certain Defendant Funds; (2) the contractual agreements which they claim establish their entitlement to certain Defendant Funds; and (3) the fact that the Defendant Funds were deposited into an account titled in the name of Claimants. (*Id.*).

Having reviewed the evidence and after the benefit of oral argument, the Court finds that the Claimants have established Article III standing to pursue a claim on the Defendant Funds. It is undisputed that the Defendant Funds were seized from an account bearing the

8

name of Claimants, and "[l]egal title is significant evidence of an individual's interest in contested property." *United States v. Any & all Funds on Deposit in Acct. No. XXXXX-XXXXXXX at HSBC Bank PLC, 55 Corp. St., Coventry, United Kingdom*, 87 F. Supp. 3d 163, 167 (D.D.C. 2015) (citing *Cambio Exacto, S.A.,* 166 F.3d at 527).  Although the Claimants conceded at oral argument that they lack *independent* dominion or control over the funds, as they were to act solely at the direction of RMH, the Government conceded that the Claimants were in actual possession of the funds when they were seized.  The Government's concession is supported by the funds being seized from an account that was controlled exclusively by González, as trustee of Claimants, and notice of the Defendant Funds' freezing being sent by JPMorgan Chase to González. Without González, no one could access the account.  González's actual possession of the Defendant Funds and control over the account are sufficient for Article III standing.[8]

Further, the Claimants have demonstrated an economic interest in the Defendant Funds such that their seizure injures the Claimants.  "Substantial economic harm is plainly the type of injury for which parties may seek redress in federal court." *Cambio Exacto, S.A.*, 166 F.3d at 527 (citation omitted).  González and Hernandez wrote in their declarations that Claimants, pursuant to the contracts, provided due diligence and paymaster services for the Blomeyer and Chapman ventures, incurring approximately

---

[8] The Court further notes that if the Government is correct in its representation that some of the funds were used to buy a new car for González's wife, this would also demonstrate that the Claimants exercised dominion and control over the funds sufficient to confer standing. *See, e.g.*, *HSBC Bank*, 87 F. Supp. 3d at 167 (finding that a claimant's "personal use of the [seized] funds is a sufficient indicia of her control over the property to dispute that she is merely a nominal owner" where the funds were not otherwise intended for her benefit).

9

$295,601 in fees and costs. (*See* docs. 25, 25-1). The declarations further describe an agreement between Claimants and RMH that Claimants would be compensated for their services from the Defendant Funds themselves. (*Id.*). The existence of this unique method of payment finds support elsewhere in the record. For example, the contracts Blomeyer and Chapman signed with RMH called for the Claimants to be compensated for their fees and costs from the Defendant Funds in the event of mutual cancellation by the parties. (*See* doc. 25-1 at 10, 18–19). This reinforces Claimants' assertion that they were not just entitled to repayment by the parties to the deal, but were entitled to repayment from the Defendant Funds themselves. Accordingly, the Claimants have demonstrated Article III standing.

**B.    Statutory Standing**

The Government next contends that "[i]n addition to Article III standing, the [C]laimants must also establish statutory standing, which, in the instant case, requires the [C]laimants to show they fall within the definition of 'owners' under 18 U.S.C. § 983(d), and therefore are properly encompassed within the 'zone of interests protected by the law invoked.'" (Doc. 41 at 9 (citing *$38,000 Dollars in U.S. Currency*, 816 F.2d at 1543–45)). The Claimants counter that "[u]nder the law as articulated by the Eleventh Circuit, which the Government omits, the Government's challenge is premature, as proof of 'ownership' is not, at this juncture, implicated." (Doc. 45 at 12–13).

The Government's "argument confuses the concepts of 'standing' with 'ownership,' which are distinct under Eleventh Circuit law." *See United States v. Real Prop., Including All Improvements Thereon & Appurtenances Thereto, Located at 246 Main St., Dansville, Livingston Cnty., New York*, 118 F. Supp. 3d 1310, 1317 (M.D. Fla. 2015). "While it is

10

true that a claimant must demonstrate both Article III standing and statutory standing to contest a civil forfeiture action, standing and ownership come into play at different stages in civil forfeiture cases and require different showings." *Id.* at 1318 (citations omitted). "Although many cases refer to [the statutory definition of ownership] as part of the 'standing' inquiry, it is in fact an element of the innocent owner's claim on the merits."[9] *United States v. One 1990 Beechcraft 1900 C Twin Engine Turbo-Prop Aircraft, Venezuelan Registration No. YV219T, Serial UC118*, 619 F.3d 1275, 1277 n.3 (11th Cir. 2010) (quoting *United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1014 (8th Cir. 2003)). Thus, the Government's "argument that [Claimants] lack[] standing because [they] cannot demonstrate [they] fit[] the statutory definition of 'owner' simply lacks merit." *See Real Prop., Including All Improvements Thereon & Appurtenances Thereto, Located at 246 Main St., Dansville, Livingston Cnty., New York*, 118 F. Supp. 3d at 1318 (citation omitted).

## C.   Other Outstanding Motions

There are four other motions currently pending before the Court: the Claimants' motion for a protective order and stay of discovery (doc. 37), the Government's motion to stay discovery (doc. 42), the Government's motion to stay the case (doc. 44), and the Claimants' motion to modify the scheduling order (doc. 47).

---

[9] The actual statutory standing inquiry in the civil forfeiture context "refers to a claimant's compliance with the procedural requirements for bringing a claim under federal forfeiture statutes and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture." *See United States v. One Parcel of Real Prop. Located at 19127 SW 65th St., Pembroke Pines, Broward Cnty., Fla.*, 2013 WL 1023506, at *2 (S.D. Fla. Mar. 14, 2013) (citation omitted). The Government does not challenge the Claimants' standing on this ground, and the Court does not address it.

11

As discussed at the recent hearing, the Court will temporarily stay this case and order the parties to meet and confer regarding their plan for this matter moving forward. The Court will further order the parties to, on or before July 25, 2025, either (a) file a new joint discovery plan as they would in a typical civil case (*see* doc. 26), or (b) file a renewed motion to stay the case.[10] Considering this course of action, these four outstanding motions are due to be denied as moot.

### V. CONCLUSION

For the reasons stated above, and for good cause, it is

ORDERED as follows:

1. The Government's motion to strike (doc. 41) is DENIED.

2. **On or before July 25, 2025,** the parties shall meet and confer regarding their plan for this case moving forward, and either (a) file a new discovery plan as they would in a typical civil case, or (b) file a renewed motion to stay the case.

3. The Claimants' motion for a protective order and stay of discovery (doc. 37), the Government's motion to stay discovery (doc. 42), the Government's motion to stay the case (doc. 44), and the Claimants' motion to modify the scheduling order (doc. 47) are DENIED as moot.

4. This case is STAYED pending further order of the Court.

---

[10] The Government represented that should the Court deny its motion to strike, the Government "will file a supplemental motion to stay supporting its motion in detail, including submitting any necessary affidavits detailing the adverse effect civil discovery would have on the related ongoing criminal investigation." (Doc. 46 at 5).

DONE this 9th day of July, 2025.

                                       /s/ Emily C. Marks
                              EMILY C. MARKS
                              CHIEF UNITED STATES DISTRICT JUDGE